UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CANON INC.,

                            Plaintiff,                    06 Civ. 3324 (PKC)

       -against-

                                          MEMORANDUM
GCC INTERNATIONAL LIMITED,                 AND
GCC MANAGEMENT LIMITED,                   ORDER
GATEHILL INTERNATIONAL LIMITED,
Q-IMAGING (USA) INC., and
TALLYGENICOM LP,

                          Defendants.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

           This action was commenced on May 1, 2006 by Canon Inc. ("Canon") against

GCC International Limited, GCC Management Limited, Gatehill International Limited, Q-

Imaging (USA) Inc., and TallyGenicom LP (collectively, "defendants") for infringement of

U.S. Patent No. 6,336,018 (the "'018 patent").  According to plaintiff Canon, claim 58 of the

'018 patent describes a type of process cartridge – sometimes called a toner cartridge – for

use in an electrophotographic image-forming apparatus, such as a laser printer or facsimile

machine.  Plaintiff Canon alleges that defendants manufacture, sell and/or distribute certain

products that infringe claim 58 under the trade names Q-Print, Q-Fax and TallyGenicom.[1]

Defendants deny infringement and have counterclaimed for a declaration that the patent is

invalid.

           On June 23, 2006, the parties appeared before me and I set a hearing for Au-

gust 23 on plaintiff's proposed motion for a preliminary injunction and argument on defen-

---

[1]  Specifically, Canon asserts the following models infringe: the Q-13A, Q-13X, Q-15A, Q-15X, Q-24A,
Q-24X, QP-12A, Q-FX8, GEN-13A, GEN-13X,  GEN-15A, GEN-15X, GEN-24X, GEN X25 and GEN FX8.

dants' proposed motion for summary judgment on the ground of non-infringement. I advised the parties that they were free to conduct discovery in aid of their positions and placed no restrictions on their ability to call live witnesses at the hearing.

The hearing was held on August 23, 2006. First, I conducted a claims construction hearing. Thereafter, I heard argument on defendants' summary judgment motion. Finally, I conducted a hearing on plaintiff's motion for a preliminary injunction. Neither side elected to call live witnesses on claim construction or the issue of a preliminary injunction. A sur-reply was handed up by plaintiff's counsel at the hearing and defendants' counsel, with the Court's permission, has filed a post-hearing response.

A preliminary injunction in a patent case is an extraordinary remedy reserved for circumstances in which the merits of movant's case are clear, the irreparable injury is manifest, the hardships tip decidedly in the movant's favor and the public interest is served by the injunction. Often justice is better served by employing other case management techniques, such as bifurcating issues, granting a reasonably tight discovery schedule and setting an early trial. Here, not unreasonably, the defendants sought an early claim construction hearing in conjunction with a pre-discovery summary judgment motion on the grounds of non-infringement. For the reasons stated herein, I reject defendants' proposed claim construction and deny their motion for summary judgment. With the claim construction issue decided adversely to them, defendants advance no other argument of non-infringement in the preliminary injunction context. I conclude that there is not "substantial merit" to defendants' invalidity attack and that plaintiff has established each other required element for the grant of a preliminary injunction.

Permissible Repair and Asserted Non-Infringement
Because Claim 58 of the '018 Patent Covers A Combination

Defendants assert non-infringement on the basis of the doctrine of permissible

repair which allows one to repair and replace a spent, disposable unpatented component of a

patented product.  See Aro Mfg. Co. v. Convertible Top Co., 365 U.S. 336 (1961); see also

Everpure, Inc. v. Cuno, Inc., 875 F.2d 300, 302-03 (Fed. Cir. 1989), cert. denied, 493 U.S.

853 (1989). Alternatively, defendants advance a theory of implied license, relying upon

Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp., 123 F.3d 1445, 1455 (Fed. Cir.

1997), cert. denied, 523 U.S. 1022 (1998) ("[W]hen a patentee sells a device without condi-

tion, it parts with the right to enforce any patent that the parties might reasonably have con-

templated would interfere with the use of the purchased device.").   Defendants assert that

they have done nothing more than manufactured and sold the replacement of a spent compo-

nent of a patented product.  They urge a construction of claim 58 of the '018 patent that

would cover the combination of both the main assembly (e.g. printer or fax machine) and the

cartridge.[2]  Because, defendants assert, the patent covers only the combination of the main

assembly and the cartridge and they do not manufacture or sell the main assembly, they have

not infringed the patent but merely offered for sale a replacement for a spent unpatented

component.  Plaintiff Canon asserts that claim 58 of the '018 patent covers the cartridge

alone.

---

[2] Defendants' motion for summary is addressed to the entirety of the '018 patent.  Plaintiff's motion for a
preliminary injunction is limited to claim 58.  Because the parties crafted their oral arguments to focus on
claim 58, I address only that claim in the context of the summary judgment motion, recognizing that the
logic of the Court's ruling likely has application to claims 1, 22, 57, 68, 73.

-4-

The assertion that claim 58 covers the combination of the main assembly and the cartridge requires me to construe the claim.  The Court of Appeals for the Federal Circuit had occasion to restate and clarify the standards for claim construction.  Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc), cert. denied, 126 S. Ct. 1332 (2006).  Phillips emphasizes that "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Id. at 1312 (citations omitted).  The "words of a claim 'are generally given their ordinary and customary meaning,'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Id. at 1312-13 (citations omitted).  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  Id. at 1313.  The specification may be the "single best guide to the meaning of a disputed term."  Id. at 1315 (citation omitted).  If it is in evidence (as it is here), the prosecution history may also have important bearing on the meaning of a claim term, but it may lack the clarity of the specification and, hence, may be less helpful.  Id. at 1317 (citations omitted).

A court may resort to extrinsic evidence, though it is of less significance and less value to the claim construction process.  Id. at 1317 (citations omitted).  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  Id. (citations omitted).  The Phillips court provided substantial guidance on the proper use of extrinsic evidence:

> In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence.  Nonetheless, because extrinsic evidence can help educate the court regarding the field of the

> invention and can help the court determine what a person of ordinary
> skill in the art would understand claim terms to mean, it is permissible
> for the district court in its sound discretion to admit and use such evi-
> dence.  In exercising that discretion, and in weighing all the evidence
> bearing on claim construction, the court should keep in mind the flaws
> inherent in each type of evidence and assess that evidence accordingly.

Id. at 1319.

Mindful of the teachings of Phillips, I begin by noting the issuance of U.S. Patent No. 5,903,803 ("the '803 patent"), a Canon-originated patent, that discloses, among other things, a cartridge including a photosensitive drum having a twisted prism projection for receiving rotational driving force from a twisted recess of an image forming apparatus. Canon inventors developed alternative cartridge configurations that are compatible with the twisted recess claimed in the '803 patent, including that claimed in claim 58.[3]  The '018 patent is not limited to cartridge configurations; it includes four independent claims (41, 42, 78 and 79) whose preambles refer to the main assembly rather than the cartridge.  The preambles of two of the claims (59, 64) refer to the "electrophotographic photosensitive drum". The preambles to the other independent claims (1, 22, 57, 58, 68, 73) refer to "A process cartridge detachably mountable to a main assembly . . . said process cartridge comprising: . . . ." The entirety of claim 58 reads as follows:

> A process cartridge detachably mountable to a main assembly of an elec-
> trophotographic image forming apparatus, wherein said main assembly
> includes a motor, a driving rotatable member for receiving driving force
> from said motor, and a hole defined by twisted surfaces, said hole being
> substantially coaxial with said driving rotatable member, said process
> cartridge comprising:
>
> a cartridge frame;
>
> an electrophotographic photosensitive drum;

---

[3] Canon filed a terminal disclaimer with respect to the '018 patent in relation to the '803 patent.

process means actable on said photosensitive drum, said process means including a developing roller for developing a latent image formed on said photosensitive drum, and a charging member for electrically charging said photosensitive drum;

a projection provided at a longitudinal end of said photosensitive drum, wherein said projection has an engaging portion for engagement with the twisted surfaces and a supporting portion for supporting said engaging portion, wherein said end of said photosensitive drum is provided with a shaft for supporting said photosensitive drum on said cartridge frame, and said engaging portion is supported on said shaft by said supporting portion, and a cross section of said supporting portion in a direction crossing with a longitudinal direction of said photosensitive drum is smaller than a cross section of said engaging portion, and said supporting portion is capable of entering said hole, and wherein when said driving rotatable member rotates with said hole and said engaging portion of said projection engaged with each other, rotational driving force is transmitted from said driving rotatable member to said photosensitive drum through engagement between said hole and said projection, and said projection is urged inwardly of said hole, wherein said engaging portion is contacted to said twisted surfaces at least three points, and wherein said end of said photosensitive drum is provided with a drum gear which is effective to transmit a driving force received by said engaging portion from the main assembly to said developing roller.

Relying upon the summary of the invention (Col. 2, l. 5), defendants argue that the objects of the claimed invention could not be achieved without the twisted surface of the hole of the machine assembly into which the cartridge would be placed. They draw much meaning from the reference in the preamble to claim 58 to "a hole defined by the twisted surfaces" and the location of said hole in the "main assembly". Defendants assert that the main assembly is not merely the environment in which the claimed invention operates but a critical component of the claimed invention. I do not read claim 58 in this manner.

Claim 58 describes the engaging portion of the projection and, in doing so, it describes the environment in which it is intended to operate. The description of the environment in which a portion of the cartridge is to operate, i.e. it is to operate in a hole in the main

assembly, does not mean that the main assembly or any portion thereof is claimed as part of the invention.  See Williams Mfg. Co. v. United Shoe, 316 U.S. 364, 369 (1942) (mentioning "other mechanical parts" in describing the environment in which the claimed invention is to "operate" and "dovetail" does not necessarily make those other parts elements of the claim).

The decision of the Federal Circuit in In re Stencil, 828 F.2d 751 (Fed. Cir. 1987) is instructive.  There, the Federal Circuit reversed a decision of the U.S. P.T.O. Board of Patent Appeals and Interference rejecting certain claims for lack of patentability; the claimed invention related to a "driver that is adapted to set a joint with a particular threaded lobed collar." Id. at 752.  The Patent Office had taken the position that the claimed distin-guishing feature of the driver was actually a feature of the collar into which the driver was to be inserted.  The Federal Circuit concluded that "[a]s a matter of claim draftsmanship, appel-lant is not barred from describing the driver in terms of the structure imposed upon it by the collar . . . ."  It was permissible, in that case, to claim features of "drivers suitable for use in combination with this collar . . . ." Id.  Here, claim 58 describes the projection into the hole with twisted surfaces (which hole is part of the main assembly).  It describes, among other things, how the "engaging portion is contacted to said twisted surfaces at least three points . . . ."  The use of this description does not convert the meaning of the claim into one covering the main assembly to which the cartridge is coupled.

In Smith Corona Corp. v. Pelikan, 784 F.Supp. 452 (M.D. Tenn.  1992), aff'd, 1 F.3d 1252 (Fed. Cir. 1993) (unpublished), the claimed invention was a ribbon cassette which was intended to be mounted into a typewriter "switch".  In deciding the post-trial mo-tions after a jury finding of infringement, the district court reaffirmed its understanding of how Stencil applied to the patent: "the Court remains convinced that, based on its interpreta-

tion of <u>Stencel</u>, '[p]atentability <u>can</u> be predicated upon how a claimed item mates with an-

other item <u>without</u> claiming the combination of the two items.'"  <u>Id.</u> at 461 (emphasis in the

original).  I conclude that the reading of <u>Stencel</u> in <u>Smith Corona</u> is correct and applies to

claim construction in this case.

   I have considered, as part of my analysis, the proffered portions of the prose-

cution history.  Defendants make much of plaintiff's attempt to distinguish a certain Suzaki

'728 patent because it did not disclose a "hole defined by a twisted surface."  (Mar. 19, 2001

Amendment)  Defendants endeavor to tie the statement to claim 58 by relying upon a con-

cluding paragraph which reads "[f]or the above reasons, Applicants submit that independent

Claims 1, 22, 41, 57, 58, 59, 64, 68, 73, 78, and 79 are allowable over the cited art."  Inserted

between the citation to Suzaki '728 and the above-quoted paragraph is a reference to three

patent applications and an issued patent as to which Canon pledged to file terminal disclaim-

ers.  Read in complete context, I cannot say that the reference to "cited art" in the quoted

paragraph was an effort to distinguish Suzaki '728 in relation to claim 58.

   I have also considered the January 31, 2000 Office Action that rejected claims

1-58 on the ground off "obviousness-type double patenting" in relation to the '803 patent.

The examiner's statement that "all the independent claims call for a driving projection/hole

on a photosensitive drum which when engaged pull longitudinally toward each other" does

not necessarily mean that the language of the claim covered the hole as distinguished from

the "driving projection".

   I conclude that the snippets from the prosecution history lack clarity and are

less helpful than the language of the claim and its preamble.  <u>See</u> <u>Phillips</u>, 415 F.3d at 1317.

To a person of ordinary skill in the art, claim 58 claims the "process cartridge" and only the

cartridge and the description of the structure in which it is to operate would not mean that the combination of cartridge and apparatus is claimed.  Summary judgment premised upon the assertion that the combination is claimed but not infringed is denied.

　　　　With respect to the implied license assertion, defendants rely upon the Federal Circuit's opinion in Hewlett-Packard in which a claim of infringement was asserted against defendants who purchased ink jet cartridges manufactured and sold by the patentee and modified the cartridges so that they could be refilled with ink and then resold. 123 F.3d at 1449.  The Court concluded that the claims related to the cartridges and not specific components thereof. Id. at 1451. The ink was not part of the claimed invention. Id. 1450. The Court observed that "the buyer has an implied license under any patents of the seller that dominate the product or any uses of the product to which the parties might reasonably contemplate the product will be put."  Id. (citing Mitchell v. Hawley, 83 U.S. 544, 548 (1872)). The Court's holding was that the modifications to the purchased item—the refilling of the ink cartridge-- were akin to a permissible repair and, hence, non-infringing. Id. at 1452.  The opinion suggested that a "reconstruction" of the cartridge by the defendants would have been an infringement of the plaintiff's patent, notwithstanding the claim of implied license by the buyer of the original unreconstructed cartridge.  Id. at 1452.  I do not read Hewlett Packard as broadly holding that a patent claiming only a component or on an auxiliary device which is intended to be used with some other invention of the patentee may not be enforced against a direct infringer who manufactures and sells the patented component or auxiliary device.

　　　　The Federal Circuit's subsequent decision in Anton/Bauer, Inc. v. PAG, LTD, 329 F.3d 1343 (Fed. Cir. 2003) sheds further light on the implied license argument and the

related "exhaustion doctrine".[4] There the patent holder sued on a patent for a batter pack connection that claimed the combination of the male and female plate.  Id. at 1345.  In the words of the Court, the patentee "places on the market one component of a patented combination that has no other use than to complete the patented combination with a second unpatented component."  Id. at 1351. Significantly, the Court pointed out that "[n]o claim in the '204 patent separately covers the male plate or the female plate." Id. at 1346-47.   The Court held, in reversing a finding of likelihood of success in the preliminary injunction context, "that by the unrestricted sale of the female plate, Anton/Bauer grants an implied license to its customers to employ the combination claimed in the '204 patent." (emphasis added).  The Court noted that the case might have had a different outcome if the patentee had secured patent protection for the unpatented components:

> [D]ifferent facts may have led to a different result . . . . Anton/Bauer could have, if novel, claimed its female plate and male plate individually in the '204 patent in order to improve its protection of its invention. If the male component were patented, PAG would potentially be liable as a direct infringer by manufacturing the part itself, avoiding the question of infringement by the patentee's customers.

Id. at 1352-53.  Here, as I have concluded, the patentee separately has claimed the process cartridge, the accused device.  The patent does not cover the combination.  The sale of the main assembly and toner cartridge does not constitute an implied license to manufacture and sell the invention described in claim 58 of the '018 patent.

---

[4] "The exhaustion doctrine is based upon the proposition that '[t]he unrestricted sale of a patented article, by or with the authority of a patentee, "exhausts" the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold'." Id. at 1349 (citing Jazz Photo Corp. v. Int'l Trade Comm'n, 264 F.3d 1094, 1105 (Fed. Cir. 2001), cert. denied, 536 U.S. 950 (2002)).

Preliminary Injunction

       On a motion for a preliminary injunction, the Federal Circuit teaches that the district court must assess four factors: "(1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest." Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1339 (Fed. Cir. 2003).  See also Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357, 1364 (Fed. Cir. 2002).  The Supreme Court has reminded district courts considering requests for injunctive relief in patent cases that the traditional rules of equity apply to such an applications, including the requirement that the movant demonstrate the likelihood of irreparable harm.  eBay, Inc. v. MercExchange, L.L.C., ___ U.S. ___, ___, 126 S.Ct. 1837, 1839 (2006) (application for permanent injunction).

       A.    Likelihood of success

       1.  Infringement. "An assessment of the likelihood of infringement, like a determination of patent infringement at a later stage in litigation, requires a two-step analysis. 'First, the court determines the scope and meaning of the patent claims asserted . . . [Secondly,] the properly construed claims are compared to the allegedly infringing device'." Oakley, 316 F.3d at 1339 (quoting Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc)).  Here, I have already construed claim 58 insofar as is relevant to the assertion of infringement.  As part of the second step, I must compare the claim to the accused devices and determine whether every claim limitation or its equivalent be found in the accused devices.  See Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29 (1997).

Plaintiffs have submitted the declaration of Lawrence B. Schein, who holds a Ph.D. in physics from the University of Illinois at Urbana, a master's degree in Physics from Columbia University and a bachelor's degree in Engineering Science from Pennsylvania State University. Dr. Schein worked for more than ten years at IBM in the field of electrographics and also worked as a researcher at Xerox, including in the field of printer technology. He has published a book entitled "Electrophotography and Development Physics" (Laplacian Press 1996). Dr. Schein has submitted a claim chart in which the accused devices are compared with each element of claim 58 of the '018 patent. The chart is supported by photographs of the accused devices. An exemplar of the accused devices has been received into evidence and examined by this Court in light of the expert submissions of the parties.

For the limited purposes of the preliminary injunction motion, defendants do not assert any non-infringement defense other than that raised by its now-rejected claim construction argument. (Aug. 23 Tr. at 57) This concession is consistent with the evidence. For each of the defendants' cartridges, the driven end of the photosensitive drum is provided with a projection including an engaging portion for engagement with the twisted surfaces of the hole, and a supporting portion for supporting the engaging portion. The drum is supported on the cartridge frame by a shaft, on which the engaging portion is supported by the supporting portion. A cross-section of the supporting portion of the accused device, taken in a direction crossing with the longitudinal direction of the drum, is smaller that the corresponding cross-section of the engaging portion. The supporting portions of the accused devices are capable of entering the hole in the driving rotatable member of the assembly. As the hole rotates with the driving rotatable member, the engaging portion of the projection engages the twisted surfaces of the hole, causing the projection to rotate with and be urged inwardly of

the hole.  The engaging portions of the accused devices are in contact with the twisted sur-

faces of the hole at three points as described in claim 58.  The driven end of the drum in-

cludes a drum gear for transmitting driving force to the developing roller.  I find that plaintiff

has demonstrated a likelihood of success in proving that each of defendants' accused prod-

ucts meets all of the limitations of claim 58 of the '018 patent.

       2.  <u>Invalidity</u>.  Defendants have attacked the validity of the '018 patent assert-

ing an obviousness defense.  35 U.S.C. § 103(a).  "In the context of a preliminary injunction,

while 'the burden of proving invalidity is with the party attacking validity,' the party seeking

the injunction 'retain[s] the burden of showing a reasonable likelihood that the attack on its

patent's validity would fail.'"  <u>Oakley</u>, 316 F.3d at 1340 (quoting <u>H.H. Robertson Co. v.</u>

<u>United Steel Deck, Inc.,</u> 820 F.2d 384, 387 (Fed. Cir. 1987)).  "When the presumptions and

burdens applicable at trial are taken into account, the injunction should not issue if the party

opposing the injunction raises "a substantial question concerning infringement or validity,

meaning that it asserts a defense that [the party seeking the injunction] cannot prove lacks

substantial merit**.**"  <u>Id.</u> (quoting <u>Tate Access Floors,</u> 279 F.3d at 1365).  "As a result, 'if [the

defendant] raises a substantial question concerning . . . validity, <u>i.e.</u> . . . [an] invalidity de-

fense that the patentee cannot prove "lacks substantial merit"' then the patentee has not es-

tablished a likelihood of success on the merits."  <u>Abbott Labs. v. Andrx Pharm., Inc.,</u> 452

F.3d 1331, 1335 (Fed. Cir. 2006) (quoting <u>Amazon.com, Inc. v. Barnesandnoble.com</u>, 239

F.3d 1343, 1350-51 (Fed. Cir. 2001)).  "Vulnerability is the issue at the preliminary injunc-

tion stage, while validity is the issue at trial."  <u>Id.</u> at 1335.

       In <u>Oakley</u>, the Federal Circuit restated the district court's task in assessing an

obviousness assertion:

> First, the court determines the scope and content of the prior art,
> and ascertains the differences between the prior art and the claims
> at issue, and resolves the level of ordinary skill in the pertinent art.
> Against this background, the [court] determines whether the sub-
> ject matter would have been obvious to a person of ordinary skill
> in the art at the time of the asserted invention . . . . In making this
> determination, we noted in <u>Kahn</u> that "[m]ost inventions arise from
> a combination of old elements and each element may often be
> found in the prior art." . . . The prior art that is considered is drawn
> from references "either in the field of the applicant's endeavor or is
> reasonably pertinent to the problem with which the inventor was
> concerned." . . . However, mere identification in the prior art of
> each element is insufficient to defeat the patentability of the com-
> bined subject matter as a whole.  Rather, a party alleging invalidity
> due to obviousness must articulate the reasons one of ordinary skill
> in the art would have been motivated to select the references and to
> combine them to render the claimed invention obvious . . . .
>
> This 'motivation-suggestion-teaching' test asks not merely what
> the references disclose, but whether a person of ordinary skill in
> the art, possessed with the understandings and knowledge reflected
> in the prior art, and motivated by the general problem facing the
> inventor, would have been led to make the combination recited in
> the claims . . . .

<u>Id.</u> at 1136 (internal quotations and citations omitted).

Defendants rely principally on three items of prior art: a European Patent Pub-

lication No. 0,586,033 (the "EP '033 publication), a Japanese Patent Publication No. 63-

008655 (the "JP '655 publication") and a cartridge, HP C3906A cartridge.  I have reviewed

the declarations of Dr. Schein and the deposition of defendants' expert, Dr. Slocum, and con-

clude that a person of ordinary skill in the pertinent art would have a bachelor's degree in

engineering and a general understanding of mechanical design principles.  The person would

have two years of experience in design work related to printers or facsimile devices or would

have had persons with such experience available to work with him.

Prior to the advent of cartridges, when a photosensitive drum outlived it useful

life, it was necessary for the end user to obtain the services of a technician to replace the

drum.  The ability of the end user to easily mount the drum-containing cartridge into the printer or fax machine led to the commercial success of cartridges and machines that employ them.  The EP '033 publication relates to a photosensitive drum, a process cartridge, an image forming apparatus and an image forming system.  The publication teaches that the cartridge is mounted by means of a helical gear arranged adjacent to a cylindrical member; it supposes that the operator can easily recognize the mounting direction of the drum on the basis of the helical gear.  The invention taught in EP '033 had the disadvantage that the failure on the part of the end user to correctly mesh the gears could lead to damage to the gears on either the cartridge or the machine.  The helical gear type cartridge is still in widespread commercial use, and one skilled in the art looking to design a detachable cartridge would look to employ helical gears in the design.

Defendants have provided very little evidence on how the HP C3906A cartridge was mounted on the machine.  No exemplar has been marked as an exhibit or provided to plaintiff's expert.  Based upon the limited data provided by defendants, Dr. Schein opines that the HP C3906A also operates by means of a helical gear mechanism.

JP '655 would have been considerably less helpful to one of ordinary skill in the art.  It discloses a device in which the drum is a component replaceable by a technician and not by the average end user.  No cartridge of any kind is disclosed.  A screw on the end of the drum is brought into alignment with a screw hole.  The motor then is rotated – presumably by hand – to tighten the screw.  The screw does not have a supporting position and hence it does not meet the limitation in claim 58 that the cross section of the supporting position is smaller than the cross section of the engaging position.

The engaging projection in claim 58 does not have the characteristics of either a screw or a helical gear.  It is simple for the end user to insert into the twisted hole on the printer or fax machine. It does not require the end user to precisely align a screw into a screw hole or mesh a gear.  Based upon a review of the prior art and guided by the experts of each side, I do not find that each element of the combined subject matter disclosed in claim 58. Even were I generously to assume that each element is disclosed in prior art references, I conclude that a person of ordinary skill in the art, fully aware of EP '033, JP '655 and the HP C3906A cartridge, and motivated by a desire to invent an end-user friendly cartridge that could be easily and comfortable installed in a printer or fax machine, would not have been led to make the combination recited in the claim 58.  The invalidity argument, I conclude, lacks substantial merit.

B.    Irreparable Harm

The Supreme Court's decision in eBay, Inc. v. MercExchange, L.L.C., 126 S.Ct. at 1840-41, makes plain that the mere fact that the Patent Act describes "the right to exclude others from making, using, offering for sale or selling the invention," 35 U.S.C § 154(a)(1), does not mean that an application for an injunction in a patent case is exempt from the "traditional principles of equity".  Consistent with those equitable principles, the movant must demonstrate the likelihood of irreparable injury in the absence of a grant of the requested injunction.

Here, money damages would not be an adequate remedy because of facts specific to these defendants.  Christopher Paul Mercer, the CEO of "GCC Group," was designated as a Rule 30(b)(6) witness on behalf of all defendants and was examined at deposition

in this case.  (Mercer Dep. at 28-29).  He explained that GCC International Limited is a hold-

ing company located in Hong Kong with an office in the British Virgin Islands and that de-

fendant Gatehill International Limited is the manufacturing arm located in China.  (Id. at 11,

89)  According to Mercer, there is an affiliated non-party company called Hawkwood which

controls Q-Imaging (USA), Inc.  (Id. at 11)  Defendant GCC International Limited is a "sales

arm".  (Id.)  "The account[s are] all consolidated amongst the group."  (Id. at 11-12)  All

transactions of GCC [companies] go through Hong Kong banks.  (Id. at 89)  All assets of

GCC Limited and Gatehill are in China, except for certain intangible assets – patents and

trademarks – that are located in Australia.  (Id. at 91)

       Only non-party "GCC, USA" and defendant Q-Imaging (USA) are located in

the U.S.  They have a leased office/warehouse in Austin, Texas.  (Id. at 19, 23.)  Mercer es-

timates the combined fixed assets in the U.S. to be "something like" $30,000.  (Id. at 21)

Other assets include "whatever inventory is on hand at any given time."  (Id. at 23.)  Q-

Imaging (USA) Inc. had (as of the date of the record produced by defendants) $84,000 in

cash on hand in a bank.  (Id. at 95)

       The principal fixed assets of the defendants are the fit-out and production

lines, molds and tools located in the town of Yulu in the Shenzhen Special Economic Zone in

China.  (Id. at 22)  Four affiliated entities supply the accused products into the U.S.: GCC

International, GCC, USA, Q-Imaging (USA) and Gatehill.  (Id. at 25)  Gatehill sells product

to Staples, the office supply retail chain.  (Id.)  GCC has supplied accused products to Tally-

Genicom and has indemnified it against claims of infringement.  (Id. at 27-28)

       At the preliminary injunction hearing, defendants' counsel did not dispute the

essential factual points of the Mercer Deposition.  He portrayed the executive offices as lo-

cated in Perth, Australia and the manufacturing arm in China.  Defendants' counsel did not know where the bank accounts were located, but stated that he would not be surprised if they were in Hong Kong.  (Aug. 23 Tr. at 109)

The defendants claim to have $35-40 million in U.S. revenue per year from the sale of 350 products, including the accused products.  (Mercer Dep. at 47-48)  Toner Cartridges amount to 70% of its U.S. business and xerographic modules for business machines comprise about 20% of the U.S. sales with the remaining products making up 10% of sales. (Id. at 16-17)  Defendants' product catalogue for 2006 views it as a lower priced competitor of the original equipment manufacturer such as Canon and that lower priced recycled cartridges are perceived in the marketplace to be of substantially lesser quality.  (Ex. QQ to 2d Divinagracia Decl.)  This is not a case where plaintiff has freely licensed the product to others.  The licenses that have been granted have been in the nature of cross-licenses and not for the manufacture and sale of products.  (Aug. 23 Tr. at 127)  Other than recycled cartridges and defendants' sales, there are no other competing products on the market and defendants acknowledge that this has enabled plaintiff to "price . . . aggressively" its product.  (Mercer Decl. at 5)  Competition from defendants would likely lead to significant price erosion.  I conclude that, in the absence of injunctive relief, Canon will continue to lose sales and market share to defendants.

Assuming that the losses to Canon could be readily calculated and reduced to a money judgment, I conclude that money damages would not be an adequate remedy in this case because of the nature and location of defendants' business.  Defendants' operations are far-flung, and locating and attaching assets sufficient to satisfy a money judgment would be exceedingly difficult.

At the hearing, I inquired as to when plaintiff learned of defendants' infring-
ing activity in relation to the commencement of this action and application for a preliminary
injunction.  Plaintiff knew or could have known of some of defendants' sales of the accused
products in the period May through November 2005.  (Aug. 23 Tr. at 100, 119)  Plaintiff per-
suasively argues that the time between discovery and the commencement of this litigation
was necessary and appropriate in order to identify the applicable claims from its patent port-
folio, the universe of accused devices on the market, the proper party defendants and where
they may be found and served.  I conclude that, under the circumstances, there has not been
lack of diligence or undue delay.  Moreover, there has been no demonstrable prejudice to de-
fendants by the passage of time.  While defendants have included the accused products in its
catalogue of products available for sale, it cites no special marketing promotion that it
launched in detrimental reliance upon Canon's inaction.  (Mercer Decl. at 12)  See, e.g.,
Kansas v. Colorado, 514 U.S. 673, 687 (1995) ("The defense of laches requires proof of (1)
lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the
party asserting the defense." (internal quotations omitted)); Penn Mut. Life Ins. Co. v. City of
Austin, 168 U.S. 685, 698 (1898) ("The reason upon which the rule [of laches] is based is not
alone the lapse of time during which the neglect to enforce the right has existed, but the
changes of condition which may have arisen during the period in which there has been ne-
glect.").

C.      The Balance Of Hardships Between The Parties

Defendants paint a dire picture if an injunction were to be granted: "[a]s a
practical matter, if they put this product line out of business, they would put the defendants

out of business . . . ." (Aug. 23 Tr. at 122)  This conclusion is reached because its current secured lender has decided to exit the finance business and it now needs to secure refinancing; efforts to secure refinancing have been difficult and would be made more difficult by an injunction.  (Mercer Decl. at 14)  Defendants also fear that their relations with at least one major customer "for an unrelated product" who accounts for 20-30% of its business would be adversely impacted.  (Id. at 15)  These assertions of hardship appear to be based upon nothing more than speculation.  The nature of defendants' business, as outlined in its 2006 product catalogue, is largely to sell OEM replacement parts in the printer business.  As noted, they sell some 350 products, including the accused devices as well as other types of toner cartridges, ink cartridges, thermal transfer ribbons, ink jet media, inkjet paper, magnetic paper, CD-R/DVD-R discs and USB flash disks.  The notion that customers would cut them off from all sales of all products simply because they were unable to sell a relatively few types of toner cartridges is based upon nothing more than pure conjecture.

The loss of profits and market share to plaintiff, on the other hand, is not speculative but is real.  I conclude that the balance of hardships tips decidedly in plaintiff's favor.

D.      The Public Interest

While the public benefits from lower prices, competition in violation of lawful patent rights hurts innovation.  There is a strong public interest in ensuring that valid patents are enforced.  Such enforcement encourages and promotes useful inventions.  None of the products at issue suffer from marketplace shortages or are otherwise necessary to the health, safety and welfare of large numbers of people.

CONCLUSION

        Plaintiff's motion for a preliminary injunction is granted on condition that a bond in the amount of $400,000 is posted by September 7, 2006. A separate order embodying the precise terms of the injunction will be entered. I also will enter an order setting forth the schedule to bring this case to trial-ready status.

        SO ORDERED.

                                           P. Kevin Castel
                                    United States District Judge

Dated: New York, New York
       August 29, 2006